## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

JOHN DOE,

              Plaintiff,                        Case No.:

                                                   Hon:

     v.

SOUTH LYON COMMUNITY
SCHOOLS, RYAN KNAPP, *in his individual and official capacity,* and SUE TOTH, *in her individual and official capacity*,

              Defendants.

David A. Nacht (P47034)
Fabiola A. Galguera (P84212)
NACHTLAW, P.C.
*Attorneys for Plaintiff*
501 Avis Drive, Suite 3
Ann Arbor, Michigan 48108
(734) 663-7550
dnacht@nachtlaw.com
fgalguera@nachtlaw.com

## PLAINTIFF'S COMPLAINT AND JURY DEMAND

    Plaintiff John Doe, through his counsel, NACHTLAW, P.C., brings his Complaint as follows:

## INTRODUCTION

    1.    Plaintiff John Doe (hereinafter "Plaintiff") brings this civil rights action against Defendants to remedy disability discrimination and retaliation in violation of Title II of the Americans with Disabilities Act ("ADA"), 29 U.S.C. § 12131, *et*

*seq.* and Michigan's Persons with Disabilities Civil Rights Act ("PWDCRA"), M.C.L. § 37.1101, *et seq.*

2.     Throughout Plaintiff's time at Salem Elementary School ("Salem"), a school within Defendant South Lyon Community Schools ("Defendant South Lyon") district, Defendants' were so neglectful that Plaintiff was repeatedly put in harms way.

3.     Plaintiff also faced disability discrimination, disallowing him from effectively participating in the school.

4.     However, Plaintiff is not seeking to enforce his right to a free appropriate public education ("FAPE") or any other remedy provided by the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.* Rather, Plaintiff is only seeking monetary damages under the ADA and PWDCRA to remedy his wholly past injuries.

5.     Plaintiff is not required to exhaust the administrative remedies under the IDEA. The IDEA exhaustion would be futile or inadequate as Plaintiff is no longer enrolled at Salem and his injuries are wholly in the past. Monetary relief, which cannot be provided by the IDEA administrative process, is the *only* relief that could make Plaintiff whole. See *Perez v. Sturgis Pub. Sch.*, 598 U.S. 142, 143 (2023); see also *Molina v. Bd. of Educ. of the Sch. Dist.*, No. 07-10948, 2007 U.S. Dist. LEXIS 91859, at *9 (E.D. Mich. Dec. 14, 2007) (holding that [IDEA

exhaustion is futile when damages are the only suitable remedy for the plaintiff's alleged injuries and yet damages are unavailable through the administrative process), citing *Covington v. Knox County School System*, 205 F.3d 912, 913 (6th Cir. 2000) (internal quotations omitted).

## PARTIES, VENUE, AND JURISDICTION

6.    Plaintiff is a minor individual residing in Washtenaw County, Michigan.

7.    Defendant South Lyon is a Michigan public school district pursuant to the School Code of 1976, M.C.L. 380.1 *et seq.*, is a recipient of federal funding, and is headquartered in South Lyon, Oakland County, Michigan.

8.    At all relevant times, Defendant Ryan Knapp ("Mr. Knapp") was employed as the Principal at Salem, a school within Defendant South Lyon's district, and in turn, this Court's district. He is sued in his individual and official capacities.

9.    At all relevant times, Defendant Susan Toth ("Ms. Toth") was employed as the Special Education Director for Defendant South Lyon's entire school district, and in turn, this Court's district. She is sued in her individual and official capacities.

10.    Venue is appropriate under 28 U.S.C. § 1391(b)(1) and (2), as Defendants are domiciled in this Court's judicial district, and because a substantial part of the events or omissions giving rise to the claim occurred in this Court's judicial district.

11.    This action arises from a violation of the ADA, and as such, this Court has original, federal question jurisdiction pursuant to 28 U.S.C. § 1331 and federal civil rights jurisdiction pursuant to 28 U.S.C. § 1343.

12.    This Court also has supplemental jurisdiction over all state claims, including PWDCRA violations pled herein, pursuant to 28 U.S.C. §1367.

## STATEMENT OF FACTS

13.    Plaintiff began attending Defendant South Lyon on October 13, 2020, as a kindergartener.

14.    Plaintiff began to exhibit problematic classroom behavior in November of 2020, exhibiting emotional distress when he switched the toys he was playing with; he was playing with cars and then switched to Legos, which violated the classroom's COVID procedure.

15.    Plaintiff's mother first became concerned about Plaintiff's lack of supervision at Defendant South Lyon when Plaintiff came home and told his mother that Plaintiff had eaten an orange crayon in class, on November 9, 2020.

16.    Plaintiff's mother notified Salem teacher Ashley Zehr that Plaintiff ate an orange crayon in class, to which Ms. Zehr responded that she had not known that Plaintiff had eaten a crayon.

17.    Plaintiff was not adequately supervised in the classroom, allowing Plaintiff to eat crayons that are toxic when consumed.

4

18.     Thereafter, Plaintiff's parents tried to work with Defendant South Lyon to help with Plaintiff's behavioral issues while also managing Plaintiff's behavior at home.

19.     Though Plaintiff had some behavioral concerns, Plaintiff continued to complete all his academic work.

20.     In early February 2021, Plaintiff's mother requested access to special education services from Defendant South Lyon because she believed Plaintiff still needed additional resources and support.

21.     In response, Plaintiff was assigned Defendant South Lyon's General Social Worker Julie Periano in early February 2021.

***Once Plaintiff Had Been Officially Diagnosed with a Disability, Defendant South Lyon Treated Him Less Favorably Than Before His Diagnosis***

22.     Later that year, around August 2021, Plaintiff underwent a formal medical evaluation for ADHD and other conditions or impairments that may have been contributing to his behavior.

23.     On August 11, 2021, Plaintiff's mother again made a request that Defendant South Lyon provide Plaintiff with special education because Plaintiff's mother was still concerned that Plaintiff's needs were not met by Defendant South Lyon.

24.     On September 13, 2021, Plaintiff's mother notified Defendant South Lyon that Plaintiff had reported to her that Plaintiff was being bullied at school.

25.     Plaintiff explained to his mother that when he was on the playground, another student was "running around hurting other students," including Plaintiff.

26.     This offending student chased Plaintiff, pushed him off playground equipment, punched him in the stomach, pulled on his genitals, and then pulled his hair.

27.     There is no clear explanation why no supervising teacher or chaperone witnessed this behavior of elementary students during recess.

28.     Upon reasonable belief, Defendant South Lyon did not conduct an investigation, nor did it reprimand any offending students.

29.     On September 15, 2021, Plaintiff's mother once again reported a new bullying incident with the same bully; this time, the same bully had grabbed Plaintiff by the neck and threw him down, causing bruising on Plaintiff's person.

30.     That same day, Salem Principal Mr. Ryan Knapp emailed Plaintiff's mother that Defendant South Lyon was notified about the incident, and that Plaintiff was instructed how to report bullying when it happened.

31.     There is no clear explanation why no supervising teacher or chaperone witnessed this behavior when it occurred.

32.     Upon reasonable belief, Defendant South Lyon did not conduct an investigation, nor did it reprimand any offending students, even after Defendant South Lyon had actual notice of the incident.

33.     In the following months, through the end of the school year in June of 2022, Plaintiff continued to have behavioral concerns at Salem as Plaintiff's parents repeatedly requested more resources.

### *Defendant South Lyon Failed to Adequately Address Plaintiff's Parents' Concerns, Repeatedly Suspending Plaintiff for Behaviors Directly Associated with His Disability*

34.     On April 18, 2022, Salem teacher Jamie Szymanski emailed Plaintiff's parents, questioning whether they were doing enough to address Plaintiff's behavior.

35.     Plaintiff's parents were offended by Ms. Szymanski's email as Ms. Szymanski's email essentially blamed Plaintiff's parents for Plaintiff's behavioral concerns.

36.     That same day, Plaintiff's mother specifically requested special education from Salem, emphasizing that Plaintiff's has special needs.

37.     Still, Plaintiff did not receive the requested special education.

38.     By April 19, 2022, Plaintiff's mother openly criticized the school's lack of action for Plaintiff.

39.     Then, on May 23, 2022, Plaintiff was officially diagnosed with ADHD and put on the necessary medication associated with ADHD.

7

40.     Still, Plaintiff had not received the requested special education.

41.     Plaintiff's mother and Defendant South Lyon at this point discussed a potential future IEP for Plaintiff.

42.     In a conversation with Plaintiff's parents in the summer, Defendant South Lyon indicated that it would like to give Plaintiff a month or two into the school year before deciding to start an IEP evaluation process.

43.     Defendant South Lyon offered no explanation for further delaying the implementation of special resources for Plaintiff.

44.     At this point, after months of criticism of their parenting and months of waiting for Defendant South Lyon to take action, Plaintiff's parents still agreed to follow Defendant South Lyon's recommendation.

45.     Unfortunately, Plaintiff did not have an easier third year at Salem.

46.     On September 20, 2022, after yet another difficult school day, Plaintiff's mother contacted Mr. Knapp and voiced her criticisms about how Defendant South Lyon was failing Plaintiff.

47.     That same day, Defendant South Lyon responded to her criticisms by insisting that Defendant South Lyon was doing everything it could.

48.     Mr. Knapp indicated in his email that day that—even given Plaintiff's disruptive behavior—they still would wait *another* month to evaluate Plaintiff.

49.    An initial meeting for the IEP was finally scheduled for October 27, 2022.

50.    In just a short few months after Plaintiff's disability diagnosis and Plaintiff's parents' request for special education services, South Lyon repeatedly and unfairly suspended Plaintiff.

51.    During the 2022-2023 academic year, Plaintiff was first suspended on October 11, 2022, after an incident in the classroom that closely resembled conduct the school allowed *before* he was officially diagnosed with a disability.

52.    Given that this suspension was right before the IEP was officially implemented, Defendant South Lyon did not make a manifestation determination nor mark Plaintiff as an IEP/504 student.

53.    When it came time for the IEP meeting on October 27, 2022, Defendant South Lyon placed Plaintiff on an ineffective and inadequate IEP.

54.    For example, on December 5, 2022, Plaintiff's father noted that the IEP's thumbs up/thumbs down chart was hurting Plaintiff as the plan had no positive reinforcement integrated and it was making school a more negative environment for Plaintiff.

55.    This negativity further exacerbated Plaintiff's behavior.

56.    Instead of addressing the concerns, Defendant South Lyon engaged in further disparate treatment of Plaintiff.

57.     Plaintiff was once again suspended on January 30, 2023.

58.     The incident that led to this suspension resulted from the use of a behavior chart, an intervention method that was not working for Plaintiff as noted by Plaintiff's father the month before.

59.     Plaintiff was then put on a Behavior Intervention Plan (hereinafter referred to as a "BIP") on April 11, 2023.

60.     Plaintiff's father noted that the plan was not helping prevent any of the bad behaviors; it seemed that—despite having an IEP—the school continued a reactionary path.

61.     The BIP clearly indicated that Plaintiff does not communicate clearly and has problems with coping skills.

62.     Nonetheless, Plaintiff continued to be punished for behavior he could not control and was directly associated with his disability.

63.     On May 1, 2023, Plaintiff's father raised concerns about the BIP's lack of positive reinforcement and proper descriptions of what makes something wrong were added to the BIP.

64.     Less than two weeks later, Plaintiff was put on another short-term suspension due to disruptive behavior, disruptive behavior which mirrored the very kind of behavior that made Plaintiff's parents beg for an IEP and special education.

65.    On a phone call on May 19, 2023, Mr. Knapp and Plaintiff's father discussed Plaintiff's behavior.

66.    Mr. Knapp suggested on that phone call that Plaintiff be taken off the medication despite medical advice indicating Plaintiff needed the medication.

67.    Plaintiff's father indicated to Mr. Knapp that he would consider doing so if it made things better at school; he did warn Mr. Knapp that there would likely be side effects and, that if that was the path suggested by school, there would be a need to re-evaluate expectations from Plaintiff.

68.    Plaintiff's father followed the suggestion and Plaintiff stopped taking the medication.

69.    Just as expected, Plaintiff's behavior was variable.

70.    Plaintiff was once again suspended on May 31, 2023, for the same behavior the IEP was supposed to be addressing and reducing.

71.    Mr. Knapp had texted Plaintiff's father indicating that he would be suspended due to leaving the classroom and building multiple times, urinating in a sewer gate, and spitting.

72.    In the documentation provided on May 31, 2023, it was discovered that Plaintiff had not just left the building; he left the school and was walking around the surrounding *neighborhood*.

73.    Furthermore, it was discovered that not only was Plaintiff seen urinating in a sewer gate, but three separate classrooms saw Plaintiff touch the urine and then lick his hand.

74.    It is unclear how Defendant South Lyon was ensuring that Plaintiff was receiving a safe educational environment at the time.

75.    The next suspension came on June 12, 2023, due, amongst several things, to Plaintiff leaving the classroom and knocking over furniture when he left the classroom.

76.    Per the BIP, the teacher should have contacted the office to report the incident.

77.    Instead, Plaintiff was suspended yet again.

78.    It was after this incident that a manifestation determination review was finally completed.

79.    It is unclear why Defendant South Lyon decided to hold the review at this point and not in the prior suspensions, which all include the same kind of behavior.

80.    The review, completed on June 15, 2023, documented that the behaviors for which Plaintiff was repeatedly suspended were in fact manifestations of his disability.

81.     Notably, the form stated that both the IEP and BIP were fully implemented despite events that showed otherwise.

82.     On February 5, 2024, there was an IEP follow-up meeting.

83.     As a result of that evaluation, Plaintiff was still not receiving the support and resources he needed.

84.     Plaintiff's father followed up with the school on February 15, 2024, listing out some concerns he had regarding the evaluation and requesting a follow-up meeting.

85.     Plaintiff's father expressed that he wanted confirmation on who would attend a discussion about the IEP as he had concerns about a "dire need of a checks and balances system."

86.     Plaintiff's father, in a second email that same day, flagged that the most recent REED evaluation was inaccurate and that he was uncomfortable with statements made on behalf of Defendant South Lyon by Mr. Knapp, including a comment about whether Plaintiff needed "a smack to the mouth."

87.     Mr. Knapp also made comments about how "CMH probably just lowered the bar to get [Plaintiff] diagnosed in order to start benefits and services" and "everybody is on the spectrum" in reaction to Plaintiff's diagnosis.

88.     Plaintiff's father further raised safety concerns, as Plaintiff had been documented leaving the school campus and being alone long enough to drink his

own urine after urinating outside on a sewer grate.

89.     Plaintiff's father also flagged how the school reacted differently when Plaintiff brought up a concern versus when he was accused of bad behavior.

90.     For example, on or about September 20, 2023, Plaintiff reported being bullied to Plaintiff's father and Plaintiff's father then reported it to the school.

91.     Upon reasonable belief, Defendant South Lyon took no further action.

92.     Six days later, Defendant South Lyon quickly reached out to Plaintiff's father regarding an incident that allegedly occurred with Plaintiff in class.

93.     When Plaintiff's father followed up with questions related to the incident, such as whether there was a witness to the event and whether there was a need to increase Plaintiff's medication dosage, he did not get an answer for almost a week.

94.     The school responded the following day, on February 16, 2024, indicating that a meeting would be set up.

95.     Plaintiff's father had a call with Sue Toth, the Special Education Administrator, on February 19, 2024, to discuss the IEE process.

96.     Plaintiff' father's email with all his concerns were brought up, but not addressed.

97.     On February 28, 2024, Ms. Toth emailed Plaintiff's father, summarizing Defendant South Lyon's position on their interventions on behalf of Plaintiff.

98.     In that same email, Ms. Toth noted that the "school has not accurately identified your frustrations."

99.     This follows Ms. Toth's sharing of Mr. Knapp's "surprise" at seeing Plaintiff's father's concerns.

100.    This email still did not address the many individualized concerns Plaintiff's father had brought up, which he pointed out in a follow-up email on February 25, 2024.

101.    Plaintiff's father noted that horrible events - like the Oxford school shooting - are a result of school administrations ignoring others' concerns.

102.    Plaintiff's father *specifically clarifies* that the reference was about ignoring concerns that can result in bad consequences.

103.    Instead of addressing Plaintiff's educational concerns, Ms. Toth decided to focus on the one part from Plaintiff's father's lengthy email that is actually unrelated to Plaintiff and the school's mismanagement of his education.

104.    Ms. Toth clearly misconstrued Plaintiff's father's point and raised created concerns about Plaintiff's—a then third grader—access to firearms.

105.   On March 1, 2024, Plaintiff's father requested a formal meeting with the IEP team before the IEE.

106.   In response, Ms. Toth said that she would prefer an informal meeting, and *if* there are topics that she believes an IEP team should consider, then—and *only* then—she would assemble the IEP team.

107.   At this point, Plaintiff's father was completely discouraged by Defendant South Lyon's response to Plaintiff's educational concerns given Plaintiff's disabilities.

108.   Consequently, Plaintiff's father withdrew Plaintiff from Defendant South Lyon in March 2024.

<u>**COUNT I**</u>
**Disability Discrimination in Violation of Title II of the American with Disabilities Act, 29 U.S.C. § 12131, *et seq*.**
*(As to Defendant South Lyon)*

109.   Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

110.   Plaintiff is an individual with multiple disabilities, including ADHD and autism.

111.   These conditions substantially limit Plaintiff's major life activities and are "qualified disabilities" under the relevant laws.

112.   The ADA was passed as a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.

113.   Title II of the ADA prohibits discrimination against qualified persons with disabilities in the provision of public services, programs, and activities of a public entity, or be subjected to discrimination by any such entity. 42 U.S.C. § 12132.

114.   It is well established that Title II of the ADA allows disabled individuals to sue public school districts that exclude them from participation in, deny them benefits of, or otherwise discriminate against them in a program because of their disability. *Gohl v. Livonia Pub. Sch. Sch. Dist.*, 836 F.3d 672, 681 (6th Cir. 2016), citing *Anderson v. City of Blue Ash,* 798 F.3d 338, 357 (6th Cir. 2015).

115.   Persons with disabilities are "qualified" if, "with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services," they meet the essential requirements for the services, programs, or activities.

116.   Congress stated in the ADA that Eleventh Amendment immunity would not apply to suits brought under the ADA. 42 U.S.C. 12202.

117.   Defendant South Lyon discriminated against due to his disability by being suspended repeatedly, failing to keep him safe, failing to give him an education, and failing to give him proper special services.

118.   Defendant South Lyon did so because of Plaintiff's disability.

17

119. Prior to Plaintiff's disability diagnosis, he did not face such adverse actions.

120. Plaintiff has suffered injury as a direct result of being disallowed from effectively participating in elementary school due to the defendant's unlawful discrimination in violation of ADA Title II's requirements.

## COUNT II
### Retaliation in Violation of Title II of the American with Disabilities Act, 29 U.S.C. § 12131, *et seq.*
*(As to All Defendants)*

121. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

122. Plaintiff is an individual with multiple disabilities, including ADHD and autism.

123. Plaintiff engaged in a protected activity under the ADA by requesting that Defendants provide him special services that aligned with his disability and reporting dissatisfaction with Defendants lack of action.

124. Because Plaintiff engaged in a protected activity, Defendants retaliated against Plaintiff by, including but not limited to, repeatedly suspending him, failing to take measures to prevent harm against Plaintiff, and discouraging Plaintiff from requesting services to help accommodate his disability or reporting any dissatisfaction with the provided services for his disability.

18

125.   As a direct and proximate result of Defendants' retaliation, Plaintiff has suffered emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.

<u>**COUNT III**</u>

**Disability Discrimination in Violation of Michigan's PWDCRA**

**M.C.L. § 37.1101, *et seq.***

*(As to Defendant South Lyon)*

126.   Plaintiff incorporates the preceding allegations as if fully set forth herein.

127.   Michigan courts view federal civil rights law as persuasive authority in interpreting Michigan civil rights law. *Harrison v. Olde Financial*, 225 Mich App 601, 606 (1997). The Michigan Court of Appeals and the Michigan Supreme Court have noted that the ADA and the PWDCRA share the same purpose and use similar definitions and analyses, and both courts have relied on the ADA in interpreting the PWDCRA. *Chiles v. Mach Shop, Inc.*, 238 Mich App 462, 472; 606 N.W.2d 398, 405 (Mich. Ct. App. 1999). *Eagle v. Hurley Med. Ctr.*, Case No. 12-13704, 20 (E.D. Mich. Jun. 27, 2013).

128.   Section 401 of the Act defines "educational institution" as meaning "a public or private institution or a separate school or department of a public or private institution, includes an academy, college, elementary or secondary school, extension course, kindergarten, nursery, school system, school district, or university, and a

19

business, nursing, professional, secretarial, technical, or vocational school, and includes an agent of an educational institution."

129.   Section 402 of the Act provides in relevant part that "[a]n educational institution shall not do any of the following: a. Discriminate in any manner in the full utilization of or benefit from the institution, or the services provided and rendered by the institution to an individual because of a disability that is unrelated to the individual's ability to utilize and benefit from the institution or its services, or because of the use by an individual of adaptive devices or aids. b. Exclude, expel, limit, or otherwise discriminate against an individual seeking admission as a student or an individual enrolled as a student in the terms, conditions, and privileges of the institution, because of a disability that is unrelated to the individual's ability to utilize and benefit from the institution, or because of the use by an individual of adaptive devices or aids."

130.   Under Section 606 of the Act, "(1) A person alleging a violation of this act may bring a civil action for appropriate injunctive relief or damages, or both. (2) An action commenced pursuant to subsection (1) may be brought in the circuit court for the county where the alleged violation occurred, or for the county where the person against whom the civil complaint is filed resides or has his or her principal place of business. (3) As used in subsection (1), 'damages' means damages for injury or loss caused by each violation of this act, including reasonable attorneys' fees."

131.   Plaintiff has suffered injury as a direct result of being disallowed from participating in elementary school due to Defendants' unlawful discrimination manifested through their exclusion and expulsion of Plaintiff because of his disability, in violation of the PWDCRA's requirements.

## COUNT IV

**Retaliation in Violation of Michigan's PWDCRA**

**M.C.L. § 37.1101, *et seq.***

*(As to All Defendants)*

132.   Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

133.   Plaintiff is an individual with multiple disabilities, including ADHD and autism.

134.   Plaintiff engaged in a protected activity under the PWDCRA by requesting that Defendants provide him special services that aligned with his disability and reporting dissatisfaction with Defendants lack of action.

135.   Because Plaintiff engaged in a protected activity, Defendants retaliated against Plaintiff by, including but not limited to, repeatedly suspending him, failing to take measures to prevent harm against Plaintiff, and discouraging Plaintiff from requesting services to help accommodate his disability or reporting any dissatisfaction with the provided services for his disability.

136.   As a direct and proximate result of Defendants' retaliation, Plaintiff has

suffered emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.

## COUNT V
### Gross Negligence
*(As to Defendants Knapp and Toth)*

137.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

138.     There were several instances where an elementary school aged Plaintiff was left unsupervised and neglected, causing him to face repeated assaults by other students and place himself in danger.

139.     The individual Defendants' conduct, described above, was "so reckless as to demonstrate a substantial lack of concern for whether an injury results", constituting gross negligence under Michigan law. MCL 691.1407(8)(a).

140.     Defendants are therefore not entitled to governmental immunity.

141.     The individual Defendants' conduct, described above, was a direct and proximate cause of injury to Plaintiff described herein.

## COUNT VI
### Intentional Infliction of Emotional Distress
*(As to Defendants Knapp and Toth)*

142.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

143.    The individual Defendants' conduct, described above, was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.

144.    The individual Defendants' conduct amounted to intentional infliction of emotional distress and caused damages to Plaintiff as described herein.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests that this Court:

a.  Find that Defendants discriminated and retaliated against Plaintiff in violation of the ADA and Michigan's PWDCRA;

b.  Award all damages to which Plaintiff is entitled under law and at equity, including compensatory damages, an award of attorneys' fees, costs, and other expenses of this litigation;

c.  Award Plaintiff all other relief as this Court deems appropriate.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff John Doe, by and through his attorneys, NACHTLAW, P.C., hereby demands a trial by jury of the issues in the above-captioned cause of action.

Respectfully submitted,

NACHTLAW, P.C.


/s/ David A. Nacht_____
David A. Nacht (P47034)
Attorney for Plaintiff

501 Avis Drive, Suite 3
Ann Arbor, MI  48108
(734) 663-7550
dnacht@nachtlaw.com

Dated: April 21, 2025